IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47144-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DALE CARTER, | |
| Appellant. | |

BJORGEN, C.J. — Following a bench trial on stipulated facts, the trial court found Dale
Carter guilty of unlawful possession of a controlled substance, methamphetamine. Carter
appeals his conviction and resulting sentence, asserting that the trial court erred (1) by failing to
suppress evidence seized after officers conducted an invalid *Terry*[1] stop, (2) by imposing a jury
demand fee in excess of the statutory maximum, and (3) by imposing legal financial obligations
(LFOs) absent a meaningful assessment of whether he had the present or likely future ability to
pay such LFOs.

Because Carter voluntarily consented to a search of his person following a lawful *Terry*
stop, the trial court properly denied his suppression motion, and we affirm his unlawful
possession of a controlled substance conviction. We accept the State's concession that the
sentencing court erred by imposing a jury demand fee in excess of that permitted under statute,
and we remand for a correction of Carter's sentence consistent with this opinion. Finally, we
reverse the imposition of discretionary LFOs and remand for consideration of whether

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

discretionary LFOs should be imposed consistently with *Blazina*[2] and former RCW 10.01.160(3) (2010).

FACTS

On April 4, 2014, the State charged Carter with one count of unlawful possession of a controlled substance. Before trial, Carter moved to suppress evidence seized by police, asserting that the evidence was the fruit of an unlawful *Terry* stop.

Following a hearing on Carter's motion to suppress, the trial court entered the following findings of fact:

> 1.1 On April 3, 2014, Officer Perry Royle (Morton Police Department) received a call from a concerned citizen indicating he (the citizen) had just observed what he believed was a drug transaction at 145 High Avenue, within the city limits of Morton.
> 1.2 The caller told Royle he saw the defendant shaking hands with another person (Joanna Johnson) and thereby receiving money and what the caller thought was drugs. The caller thought he saw what amounted to a palm to palm pass.
> 1.3 The caller was Randy Dunaway.
> 1.4 Dunaway was personally known to Officer Royle. Royle knew Dunaway to be a reliable individual. Royle had known Dunaway for over ten years.
> 1.5 Dunaway gave a basic description of the vehicle that was involved in the transaction to law enforcement.
> 1.6 Deputy Lauer [Lewis County Sheriff's Office] and Officer Royle saw the vehicle and pulled the vehicle over. Officer Thompson joined them.
> 1.7 The driver of the vehicle was the defendant, Dale Carter.
> 1.8 Royle asked Carter to step from the vehicle.
> 1.9 Carter got out of the car. Royle asked Carter if Joanna handed him some drugs.
> 1.10 Carter denied being handed anything.
> 1.11 Royle asked Carter if he would mind showing him what's in his front pants pocket.
> 1.12 Carter asked if he had to.
> 1.13 Royle told Carter, "No." Royle further told Carter that it was strictly voluntary.
> 1.14 Carter pulled out of his front pocket some coins and a small baggie of what appeared to Royle to be a small amount of marijuana.

---

[2] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

1.15 Royale [sic] asked Carter if he would mind Officer Thompson searching Carter further. Once again, Carter gave the officer permission to search him.
1.16 Thompson searched Carter and found a small baggie with a white crystal substance in it.
1.17 Carter was then placed under arrest.
1.18 The substance later tested positive for methamphetamine.

Clerk's Papers (CP) at 19-20.

Based on the above findings, the trial court denied Carter's suppression motion, concluding:

2.1 The initial stop of the defendant was lawful because the officers had an articulable suspicion, based on information from a known, named and reliable citizen informant.
2.2 The information the officers had when they stopped the defendant was that the defendant may have been in possession of a controlled substance. This was a *Terry Stop*.
2.3 The defendant consented to being searched after being told he did not have to consent, and that the search was voluntary. Therefore, the search of the defendant's person was lawful.

CP at 21 (emphasis in original).

Shortly before jury selection, Carter waived his right to a jury trial and agreed to proceed to a bench trial on stipulated facts. Following the bench trial, the trial court found Carter guilty of unlawful possession of a controlled substance.

At sentencing, the State requested the trial court to impose various LFOs, including a jury demand fee of $1,417.78. Carter contested only the imposition of court-appointed counsel costs, noting that he had retained his defense counsel. The State agreed that Carter should not pay court-appointed counsel costs as part of his LFOs. The sentencing court thereafter imposed the State's requested LFOs, including the $1,417.78 jury demand fee but absent the court-appointed

counsel costs, without first inquiring into Carter's ability to pay those LFOs. Carter appeals his conviction and resulting sentence.

ANALYSIS

I. MOTION TO SUPPRESS

Carter first asserts that the trial court erred by failing to suppress evidence obtained during a search of his person. Specifically, Carter contends that the *Terry* stop leading to the search of his person was invalid because officers lacked the required articulable suspicion of criminal activity to initiate the stop.[3] We disagree and affirm Carter's conviction.

When reviewing a trial court's ruling on a suppression motion, we review the trial court's findings of fact for substantial evidence and its conclusions of law de novo. *State v. Fuentes*, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). Where, as here, an appellant does not assign error to the trial court's findings of fact following a suppression hearing, such findings are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

In general, the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution prohibit police from seizing individuals absent a warrant.[4] *Fuentes*, 183 Wn.2d at 157-58. "[W]arrantless seizures are per se unreasonable, and the State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the

---

[3] Carter challenges only the validity of the *Terry* stop and does not challenge the trial court's conclusion that, subsequent to the *Terry* stop, he had voluntarily consented to a search of his person.

[4] A "seizure" of an individual occurs under article I, section 7 "when an officer restrains—physically or by a show of authority—that person's freedom of movement to such an extent that a reasonable person would not feel free to leave or to decline the officer's request and terminate the encounter." *Fuentes*, 183 Wn.2d at 158 n.7.

rule." *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). Exceptions to the warrant requirement are "'jealously and carefully drawn.'" *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)).

One such exception to the warrant requirement is a brief investigatory detention, also known as a *Terry* stop. *State v. Z.U.E.*, 183 Wn.2d 610, 617, 352 P.3d 796 (2015). For a *Terry* stop to be valid, the officer must have "a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). Information supplied by an informant may provide an officer with the requisite reasonable suspicion to conduct a *Terry* stop, so long as the informant's tip demonstrates "some 'indicia of reliability' under the totality of the circumstances." *Z.U.E.*, 183 Wn.2d at 618 (quoting *State v. Sieler*, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980)). We require that there either be (1) circumstances establishing the informant's reliability or (2) some corroborative observation, usually by officers. *Z.U.E.*, 183 Wn.2d at 618.

When evaluating the informant's reliability, we may consider (1) the veracity of the informant and (2) whether the informant provided a sufficient factual basis to support his or her suspicion of criminal activity. *Z.U.E.*, 183 Wn.2d at 619-21. However, neither of these factors are necessary elements to conclude that an officer's suspicion was reasonable. *Z.U.E.*, 183 Wn.2d at 620. Instead, "[t]he appropriate constitutional analysis for a stop precipitated by an informant is a review of the reasonableness of the suspicion under the totality of the circumstances." *Z.U.E.*, 183 Wn.2d at 620-21.

Evaluating the totality of circumstances here, we hold that the citizen's tip to Officer Royle was sufficiently reliable to justify Carter's investigatory detention. From the trial court's

unchallenged findings of fact it was established that Royle had personally known the citizen for over 10 years and found him to be a reliable individual. Because the citizen was an eyewitness to the suspected crime and was known to police, he was presumptively reliable. *State v. Howerton*, 187 Wn. App. 357, 366-67, 348 P.3d 781, *review denied*, 184 Wn.2d 1011 (2015).

> When a citizen informant provides information, a relaxed showing of reliability suffices "because there is less risk of the information being a rumor or irresponsible conjecture which may accompany anonymous informants and an identified informant's report is less likely to be marred by self-interest."

*State v. Ollivier*, 178 Wn.2d 813, 850, 312 P.3d 1 (2013) (quoting *State v. Gaddy*, 152 Wn.2d 64, 73, 93 P.3d 872 (2004)), *cert. denied*, 135 S. Ct. 72 (2014).

Carter argues that there is no evidence that the informant was reliable, contending that although Royle knew the informant, that person had never before served as an informant. Carter claims that reliability refers to whether the person was a known *informant*, not just a known *person*. The law does not support Carter's position. As noted above, the law presumes that citizen informants are reliable. *Ollivier*, 178 Wn.2d at 850. There is no requirement that the citizen have a history as an informant to qualify for this presumption.

Carter further argues that a valid *Terry* stop also requires that a reliable individual's tip contain a sufficient factual basis supporting the suspicion of criminal activity. Our Supreme Court rejected this form of analysis in *Z.U.E.*, holding that, although (1) the veracity of the informant and (2) the factual basis supporting the tip were both appropriate factors to consider when determining whether the tip carried the requisite indicia of reliability, the factors were not to be treated as required elements in concluding that an officer's suspicion was reasonable. 183 Wn.2d at 620. In addition, here the citizen provided officers with a sufficient factual basis to support an articulable suspicion of criminal activity, telling officers that he saw Carter exchange

money and what he believed to be drugs with another individual in a "palm to palm pass." CP at 19.

Carter argues that *Sieler*, 95 Wn.2d 43 supports his claim that this *Terry* stop was impermissible. However, *Sieler* is clearly distinguishable from the present case. The informant in *Sieler* was named but was unknown to officers, and the officers were told only that "a drug transaction had possibly occurred" without any factual basis supporting the "bare conclusion" that a crime had taken place. 95 Wn.2d at 45, 49.

In contrast with the named but unknown informant in *Sieler*, Royle had personally known the citizen involved here for over 10 years and believed him to be trustworthy. Further, in contrast with the *Sieler* informant's bare conclusion that "a drug transaction had possibly occurred," here the citizen stated the particular facts giving rise to his suspicion that Carter was engaged in an illegal drug transaction. 95 Wn.2d at 45. Carter's reliance on *Sieler* is thus unavailing, and we hold that under the totality of the circumstances, the tip here bore sufficient indicia of reliability to justify a *Terry* stop. Accordingly, we hold that the trial court properly denied Carter's suppression motion and, thus, affirm Carter's conviction.

## II. JURY DEMAND FEE

Next, Carter contends that the sentencing court erred by imposing a jury demand fee in excess of the statutory maximum. The State concedes this error.[5] We accept the State's concession and remand for a correction of the jury demand fee in Carter's judgment and sentence.

---

[5] Carter did not assign error to the entire jury demand fee, and the State only conceded that the amount of the fee over the statutory maximum was erroneous.

As an initial matter, we have previously determined that a challenge to the imposition of a jury demand fee in excess of the statutory maximum is not appealable as a matter of right. *State v. Hathaway*, 161 Wn. App. 634, 651-52, 251 P.3d 253 (2011). However, in *Hathaway*, we applied RAP 1.2(c) to address the issue so as to "facilitate justice and likely conserve future judicial resources." 161 Wn. App. at 652. In the interests of justice, we again apply RAP 1.2(c) to address Carter's contention with the imposition of a jury demand fee in excess of the statutory maximum. *Hathaway*, 161 Wn. App. at 652.

Former RCW 36.18.016(3)(b) (2009) provided in relevant part,

Upon conviction in criminal cases a jury demand charge of one hundred twenty-five dollars for a jury of six, or two hundred fifty dollars for a jury of twelve may be imposed as costs under RCW 10.46.190.[6]

We agree with Carter and the State that the $1,417.78 jury demand fee imposed here exceeds the limit imposed under former RCW 36.18.016(3)(b). We therefore remand Carter's sentence for a correction of the jury demand fee. *Hathaway*, 161 Wn. App. at 652-53.

### III. LEGAL FINANCIAL OBLIGATIONS

Carter contends that the trial court erred by imposing LFOs without making an individualized inquiry into his ability to pay, as required by *Blazina*, 182 Wn.2d at 839. Carter also argues that the LFOs imposed are unconscionable and should not be allowed in any event.

In *State v. Lyle*, 188 Wn. App. 848, 850, 355 P.3d 327 (2015),[7] *remanded*, 365 P.3d 1263 (2016), the majority opinion held that a defendant sentenced after we issued our decision in *Blazina*, 174 Wn. App. 906 waives a challenge based on the failure to make an individualized

---

[6] The language of this provision remains unchanged in the current version of the statute.

[7] Bjorgen, A.C.J., dissenting.

determination of ability to pay by not raising it in the trial court. Carter was sentenced after our 2013 decision in *Blazina* and did not object to LFOs in the trial court.

However, in light of our Supreme Court's recent order granting the petition for review in *Lyle*, 365 P.3d 1263, and its opinion in *State v. Marks*, ___ Wn.2d ___, 2016 WL 743944 (Feb. 2016), we no longer will apply the categorical majority rule in *Lyle*. Instead, we will determine on a case-by-case basis whether to exercise our discretion to reach such challenges when not raised in the trial court.

Turning to that determination, the record contains a representation by Carter's counsel that Carter works essentially job-to-job, making a subsistence living. More importantly, Carter stated in his declaration for court-appointed appellate counsel that he made approximately $8,500 in 2014 through part time work, has no money in saving or checking accounts, does not own any stocks, bonds, or notes, has expenses for rent, power, and food of $1,200 per month or more, and owns a 1991 Lincoln and a 1991 Firebird. The State responded that the fact Carter did not qualify for court-appointed counsel was a sufficient basis for the court's decision that Carter had the present ability to pay LFOs at the rate of $25 per month.

The trial court's decision, however, was couched in the same sort of conclusory, boilerplate language found inadequate in *Blazina*, 182 Wn.2d at 838. Apart from that boilerplate language, the record discloses no consideration of Carter's ability to pay by the trial court when imposing discretionary LFOs. In fact, the only consideration of Carter's financial circumstances came during the consideration of court-appointed appellate counsel, after LFOs had been imposed. The court held it would need more detail about Carter's income and expenses before appointing appellate counsel.

9

In *Blazina* our Supreme Court remanded for an individualized determination of current and future ability to pay discretionary LFOs, even though the defendant had not raised the issue at sentencing, because it found that the pernicious consequences of "broken LFO systems" on indigent defendants "demand" that it reach the issue, even though it was not raised in the trial court. *Blazina*, 182 Wn.2d at 830, 835. Without deciding its truth, the evidence noted above shows that those same consequences[8] may face Carter, whether or not he had indigent status in this case. Carter's ability to pay the LFOs can only be determined through the individualized determination the Supreme Court required in *Blazina*. The trial court failed to make that determination. Accordingly, like the Supreme Court in *Blazina*, we exercise our discretion and remand to the trial court for reconsideration of the discretionary LFOs consistent with former RCW 10.01.160(3) and the principles of *Blazina*, 182 Wn.2d at 838-39.[9]

CONCLUSION

We affirm Carter's conviction, but reverse the imposition of discretionary LFOs and remand for an individualized determination of Carter's current and future ability to pay those LFOs, consistently with *Blazina* and former RCW 10.01.160(3). We also remand for correction of the jury demand fee to comply with the statutory maximum permitted under former RCW

---

[8] With this, we do not suggest that evidence of financial difficulty is necessary before we may exercise our discretion to reach this issue.

[9] We decline Carter's invitation to declare the LFOs unconscionable and void. Such a determination must rest on fact finding that this court cannot carry out.

No. 47144-2-II

36.18.016(3)(b).

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Bjorgen, C.J.

We concur:

Maxa, J.

Sutton, J.

11