# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ANTHONY EDWARD BALLENTINE,<br><br>Appellant. | No. 76535-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: September 24, 2018 |
|---|---|

2018 SEP 24 AM 9:59 COURT OF APPEALS DIV I STATE OF WASHINGTON FILED

LEACH, J. — Anthony Ballentine appeals his conviction for burglary in the second degree. He claims that the trial court should have suppressed evidence from his initial detention as the fruit of an unlawful stop. He also challenges the court's admission of statements he made during police questioning because that questioning violated his right against self-incrimination. Finally, he challenges the court's decision to exclude evidence related to a police tip, asserting that the evidence is not hearsay. We reject his challenges and affirm.

## BACKGROUND

On July 27, 2016, King County Sheriff's Office (KCSO) Deputy Jeremy Dallon was patrolling the 15200 block of Aurora Avenue North in Shoreline, Washington. At about 2:30 a.m., he left his vehicle to investigate a stopped car in the northbound lane. He heard an alarm coming from Seattle Ski & Snowboard, located at 14915 Aurora Avenue North. The person in the stopped

vehicle was pointing to the south. When he looked, Deputy Dallon saw a man about 50 yards away, running south. Deputy Dallon described the man as wearing dark clothing, "running south . . . on the west side of the road [apparently] carrying something." The area was dark and lit only by streetlights. Deputy Dallon did not notice the man's race, whether he had a backpack, and did not see him coming out of a shop. Deputy Dallon broadcast his observation of the man running south in dark clothing to other officers.

Deputy Dallon continued to search the area nearby and took statements from people he encountered. He followed up on one person's statement and discovered a broken cash register on a walkway to the northwest of the Rodeway Inn.[1] He found receipts with the name "Seattle Ski" scattered near the register. Deputy Dallon notified dispatch of the register.

A civilian told him that a person was behind the nearby Tic-Tac restaurant. Deputy Dallon searched this area and found nothing of interest to the investigation.

Meanwhile, other officers responded to the alarm, including KCSO Deputy Nicholas Manley. Deputy Manley was in the parking lot south of the motel and about 50 feet south of where Deputy Dallon found the register. Ballentine was running "south and then sort of southeast" of the southwest corner of the hotel toward him. Ballentine "was running, out of breath, looking over his shoulder,

---

[1] At the time of the occurrences, the building was called the Rodeway Inn. The name was changed to Americas Best Value Inn by the time of trial.

and was tripping over his own feet." Behind him was a deputy in a patrol car. Deputy Manley did not see anyone else on the street. At approximately 2:40 a.m., Deputy Manley "ordered Mr. Ballentine to the ground, and Mr. Ballentine complied." Deputy Dallon arrived to help Deputy Manley and noticed blood on Ballentine's hands. At this point, the deputies arrested Ballentine. An officer searching Ballentine after the arrest found "wads of cash" with "blood on some of the bills."[2]

After Ballentine's arrest, Deputy Dallon read him his Miranda[3] rights. Deputy Dallon spoke to him for about 45 minutes and throughout asked Ballentine multiple times whether he understood his rights. Ballentine did not respond, but he did answer several other questions asked by deputies. When Deputy Dallon asked Ballentine about the cash register, he denied any knowledge of it. When asked how he had cut his hand, he told Deputy Dallon that it happened earlier in the day. Deputy Dallon asked him if he wanted to make a statement, and he replied that he did not.

KCSO Sergeant Brandon Moen arrived and asked whether Ballentine had been read his Miranda rights. Deputy Dallon said yes, but he did not tell Sergeant Moen that Ballentine refused to make a formal statement. When Sergeant Moen asked Ballentine about his injury, he again claimed to have cut

---

[2] KCSO Deputy Kociaj conducted the search but subsequently quit the force. Deputy Dallon testified as to what he observed during the search.

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

his hand earlier that day. When asked, Ballentine told Sergeant Moen that he had earned the cash in his pockets by selling drugs. He did not know how much money he had because he had made so much.

Neither Deputy Dallon nor Sergeant Moen had any difficulty talking with Ballentine or saw any need for a translator. The trial court found that both "Deputy Dallon and Sergeant Moen reasonably believed that Ballentine had not invoked his right to remain silent." It also found that "[a]t no point during his contact with the deputies did Mr. Ballentine say he wished to remain silent, or words to that effect; or that he did not want to talk further with the deputies; or that he wanted to speak to an attorney." Ballentine does not dispute these findings.

Officers investigating Seattle Ski found broken glass at the store and saw that there was no cash drawer. The parties stipulated that the DNA (deoxyribonucleic acid) profile and type extracted from the blood on the cash register matched that extracted from Ballentine's cheek with a swab.

The jury found Ballentine guilty of burglary in the second degree. He appeals.

## DISCUSSION

### Suppression of Evidence

Ballentine claimed his initial detention violated his constitutional right against unreasonable search and seizure and asked the trial court to suppress the fruits of the initial detention and search. He similarly claimed that he had

asserted his right to remain silent and asked the court to suppress his statements made to the police.

The trial court held pretrial hearings on these requests. The court found the initial detention and questioning lawful and denied the request to suppress the evidence seized at it. It also ruled that Ballentine's statements to the police were admissible because Ballentine did not clearly assert his right to remain silent when he said he did not want to make a statement.

## A. Standard of Review

When this court reviews a trial court's decision to deny a request to suppress evidence, we review the record to see if substantial evidence supports the court's findings of fact.[4] We consider unchallenged findings of fact as true on appeal.[5] Here, the trial court did not file its findings of fact until January 8, 2018, after the appellant's brief was filed. However, on March 8, 2017, the court circulated a draft and received no objections or comments from either party. And neither party submitted a supplemental brief contesting the findings. We review a trial court's legal conclusions de novo.[6]

## B. Warrantless Search

Ballentine asserts that Deputy Manley did not have a sufficient reasonable suspicion to support his detention of Ballentine. We disagree.

---

[4] State v. Weyand, 188 Wn.2d 804, 811, 399 P.3d 530 (2017).
[5] State v. Harris, 106 Wn.2d 784, 790, 725 P.2d 975 (1986).
[6] Weyand, 188 Wn.2d at 811; State v. I.B., 187 Wn. App. 315, 319-20, 348 P.3d 1250 (2015).

Both the Fourth Amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution prohibit any unreasonable search and/or seizure. When a party presents an issue that involves both the state and federal constitutions, this court analyzes the state constitutional issue first.[7] We analyze the federal constitution only if the state constitution does not protect the conduct at issue.[8] The Washington State Constitution article I, section 7 "'grants greater protection to individual privacy rights than the Fourth Amendment.'"[9] Under both, a court presumes that a warrantless seizure of evidence of a crime is unreasonable unless the State can show that the action falls under one of a few very limited exceptions.[10] Brief questioning during a Terry[11] investigative stop is one of these exceptions.

In general, the analysis of the validity of a Terry stop is fairly similar under both article I, section 7 and the Fourth Amendment.[12] The State must show that the officer reasonably suspected that the person was engaged in, or was about to engage in, criminal activity.[13] Reasonable suspicion is a lower standard than probable cause, but the officer's reasonable suspicion must be based upon "specific and articulable facts[ ] that the person stopped has been or is about to

---

[7] State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015).

[8] Z.U.E., 183 Wn.2d at 617.

[9] State v. Flores, 186 Wn.2d 506, 512, 379 P.3d 104 (2016) (quoting State v. Harrington, 167 Wn.2d 656, 663, 222 P.3d 92 (2009)).

[10] State v. Acrey, 148 Wn.2d 738, 746, 64 P.3d 594 (2003).

[11] Terry v. Ohio, 392 U.S. 1, 30-31, 88 S. Ct. 1868, 20 L .Ed. 2d 889 (1968).

[12] Z.U.E., 183 Wn.2d at 617.

[13] Terry, 392 U.S. at 30-31; Weyand, 188 Wn.2d at 811.

be involved in a crime."[14]   The state constitution provides more protection because article I, section 7 requires that the State show the officer was investigating a particular crime rather "than a mere generalized suspicion that the person detained is 'up to no good.'"[15]

To decide the reasonableness of a stop, a court evaluates the totality of the circumstances.  Factors a court considers include the training and experience of the officer, the stop's location, purpose and duration, the intrusiveness of the stop on the suspect's liberty, and the conduct of the suspect.[16]  In the absence of a reported crime, the flight of a suspect from police does not by itself provide sufficient evidence to support a warrantless investigative detention.[17]  It can, however, be a factor that, along with other indications of criminal activity, justifies an investigative stop.[18]  If a court finds that the stop was unlawful, generally the court must suppress all evidence the search produced.[19]

Here, given the totality of the circumstances, Deputy Manley had a reasonable suspicion that Ballentine was involved in the burglary of Seattle Ski. Deputy Manley arrived in response to Deputy Dallon's report that a burglary had just occurred at Seattle Ski.  He knew to look for a person running south from Seattle Ski.  Soon after he arrived south of Seattle Ski and about eight minutes

---

[14] Acrey, 148 Wn.2d at 747.

[15] Z.U.E., 183 Wn.2d at 618.

[16] Acrey, 148 Wn.2d at 747.

[17] State v. Howerton, 187 Wn. App. 357, 375, 348 P.3d 781 (2015).

[18] State v. Gatewood, 163 Wn.2d 534, 540, 182 P.3d 426 (2008).

[19] Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d. 441 (1963); State v. Larson, 93 Wn.2d 638, 645-46, 611 P.2d 771 (1980).

after Deputy Dallon had contacted him about the suspected burglary, he saw Ballentine running toward him, "out of breath, looking over his shoulder, and . . . tripping over his own feet." Deputy Manley saw no one else except a deputy in a patrol car following Ballentine on the street. None of the other deputies participating in the investigation encountered a person matching Deputy Dallon's description before Deputy Manley stopped Ballentine.

At the time, some 24-hour businesses operated in the area. However, apart from the Rodeway Inn, these were at the 15500 block, the 15200 block, and the 14500 block of Aurora Avenue North. None of these were in the area that included Seattle Ski just north of 14900 south to the location where Deputy Manley detained Ballentine, near the 14600 block of Aurora Avenue North. The location of these businesses being in the area does not undermine Deputy Manley's reasonable suspicion. As Deputy Manley indicated, in his four years of experience patrolling the Aurora corridor, it was rare for people to be walking around the area at 2:30 a.m. Ballentine has not challenged the trial court's finding of fact that "[t]he deputies were all familiar with the area and knew that pedestrian traffic in that two-block area was uncommon at that time of night."

C. *Assertion of Right against Self-Incrimination*

Ballentine contends that he adequately invoked his right to remain silent, making his statements to the police inadmissible.

-8-

The Fifth Amendment to the United States Constitution protects against compelled self-incrimination.[20] A confession made during a custodial interrogation is compelled in violation of the Constitution unless the State shows that officers informed the suspect of his right to remain silent, and he knowingly and intelligently waived that right.[21] The suspect may invoke the right to remain silent at any time before or during questioning and once it is invoked, questioning must stop.[22] This invocation must be unequivocal, and officers may continue questioning even if a suspect gives an equivocal statement indicating a wish to remain silent.[23]

Also, if the suspect's statement is not facially clear and unequivocal, officers are not required to clarify whether the suspect meant to unequivocally invoke Miranda.[24] A court cannot use words spoken after a suspect clearly and unequivocally invokes Miranda to "retroactively cast doubt" on the suspect's assertion of his right to remain silent.[25] If the plain language and the context of the suspect's assertion of his right against self-incrimination is such that a "'reasonable police officer in the circumstances' would understand it to be an assertion of the suspect's rights," it is unequivocal.[26]

---

[20] Miranda, 384 U.S. at 457-58.

[21] Miranda, 384 U.S. at 471, 479.

[22] Miranda, 384 U.S. at 473-74.

[23] Davis v. United States, 512 U.S. 452, 461-62, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

[24] Davis, 512 U.S. at 461-62.

[25] In re Pers. Restraint of Cross, 180 Wn.2d 664, 683, 327 P.3d 660 (2014).

[26] Cross, 180 Wn.2d at 682-83 (quoting Davis, 512 U.S. at 459).

Courts have found the following statements to be unequivocal assertions: "I would rather not talk about it"[27] and "I don't want to talk about it."[28] Similarly, courts have found a headshake "no" after being asked to talk about an incident to be an unequivocal assertion.[29] In contrast, the statement, "I don't want to talk right now, man" on the heels of "I just write it down, man. I can't do this. I, I, I just write, man. I don't, I don't want . . . I don't want to talk right now, man" was, according to the court, equivocal and simply an expression of "preference for the means of communication."[30] Also a suspect's statement that he does not want to say anything incriminating is equivocal.[31]

Here, the deputies reasonably decided that Ballentine had not asserted his right to remain silent. Ballentine claims that he invoked his Miranda rights when he responded to Deputy Dallon that he did not want to make a statement after being asked if he wanted to. This response answered the question whether Ballentine wanted to make a formal statement rather than unequivocally asserting his right to remain silent about the incident in its entirety. In this way, his statement is like the situation in Walker, where the defendant indicated he did not want to say anything incriminating but also continued speaking to the

---

[27] State v. Gutierrez, 50 Wn. App. 583, 589, 749 P.2d 213 (1988) (emphasis omitted).

[28] Cross, 180 Wn.2d at 684.

[29] I.B., 187 Wn. App. at 323-24.

[30] State v. Piatnitsky, 180 Wn.2d 407, 414-15, 325 P.3d 167 (2014).

[31] State v. Walker, 129 Wn. App. 258, 274, 118 P.3d 935 (2005).

police.[32] It does not fall into the same category of statement as Gutierrez[33] or Cross[34] where defendants unequivocally asserted a right to remain silent.

## Exclusion of Hearsay Evidence

Ballentine claims the trial court should have admitted testimony about a report of other people in the vicinity because he offered it to show its effect on the police. However, Ballentine did not offer it for this purpose at trial. RAP 2.5(a) allows this court to refuse to review an issue not raised at trial unless there is an issue of trial court jurisdiction, a "failure to establish facts upon which relief can be granted," or "manifest error affecting a constitutional right."

At trial, Ballentine acknowledged that the offered statement was hearsay but claimed, first, that it was admissible under the business record exception and, second, that it was a present sense impression. The trial court disagreed and excluded it.

Ballentine attempts to conflate an argument that the trial erroneously excluded a statement that he offered to show its effect on the listener with a discussion of the importance of information about police procedure which he, to some extent, did raise below. But the discussion below focused on its use for impeachment. Since Ballentine questioned Deputy Dallon at trial about the existence of the statement and Deputy Dallon affirmed its existence and indicated he had followed up on it, Ballentine has not shown any need for the

---

[32] Walker, 129 Wn. App. at 276.
[33] Gutierrez, 50 Wn. App. at 589.
[34] Cross, 180 Wn.2d at 684.

statement to be admitted for impeachment purposes. Thus, the central argument that Ballentine raises here, about the statement being admissible to show its effect on the listener, is not properly before this court.[35]

## CONCLUSION

We reject Ballentine's assertions that the trial court should not have admitted evidence obtained during an initial search or his statements made during questioning. We also reject Ballentine's assertion about the trial court's exclusion of evidence of a report of other people in the area of his detention. We affirm.

_Leach, J._

WE CONCUR:

_Smith, J._                          _Mann, J._

---

[35] RAP 2.5(a).

-12-