# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50782-0-II |
| Respondent, | |
| v. | |
| GABRIEL JOSEPH MORALES, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, A.C.J — Gabriel Joseph Morales appeals his convictions and sentence for unlawful possession of a controlled substance with intent to deliver, unlawful possession of a controlled substance, unlawful possession of a firearm, and possession of a stolen firearm. He argues (1) the trial court abused its discretion in failing to rule on his requests to proceed pro se, (2) he was provided ineffective assistance of counsel, and (3) certain cost provisions in his judgment and sentence are no longer authorized and should be stricken. Morales also raises numerous issues in a statement of additional grounds (SAG). We affirm Morales's convictions, but remand to the sentencing court to strike the imposed criminal filing fee and Deoxyribonucleic acid (DNA) fee.

No. 50782-0-II

## FACTS

A.    COMMUNITY CUSTODY VIOLATIONS

Morales was placed on community custody[1] supervision in April 2015.  As a condition of community custody, Morales was prohibited from possessing controlled substances without a valid prescription.  He was also prohibited from possessing a firearm, ammunition, or explosives.

In December, Morales's supervising community corrections officer (CCO), Sara Thompson, received multiple reports that Morales was violating the terms of his community custody.  Law enforcement reported that Morales was suspected in a shooting incident because a pool of the victim's blood was discovered on Morales's front porch.  Approximately a week later, the mother of the leaseholder for Morales's residence called CCO Thompson and complained of "drug traffic" in and out of Morales's apartment.  1 Verbatim Report of Proceedings (VRP) (Jan. 5, 2017) at 23.  The informant had witnessed drug users and sellers entering and leaving Morales's apartment at all hours of the night.  The informant also told CCO Thompson that Morales likely had a gun in his house and was rumored to have shot someone.

Around this same time, Morales's drug treatment provider informed CCO Thompson that several of Morales's recent urinalysis samples had tested positive for opiates.  Morales's treatment provider also noted that Morales had repeatedly failed to attend his required drug treatment classes.

---

[1]  "Community custody" is a portion of an offender's sentence that is served in the community subject to controls placed on the offender's movement and activities by the Department of Corrections.  RCW 9.94A.030(5).  The details of Morales's underlying convictions that resulted in community custody placement are not contained in the record before this court.

2

B.    SEARCH OF MORALES'S RESIDENCE

Based on the information received, CCO Thompson suspected that Morales had violated the terms of his community custody by possessing and using controlled substances and a firearm. CCO Thompson and two other CCOs went to Morales's residence and knocked on the door. Morales and Faye Reynolds answered the door. The officers detained Morales and searched the residence.

The officers found various drug paraphernalia, including a digital scale, small plastic baggies, and hypodermic needles. They also found packages of narcotics in the pocket of a jacket lying on Morales's bed.

CCO Thompson found an empty gun magazine in Morales's bedroom. Multiple people, including Reynolds, told CCO Thompson that Morales had been driving the vehicle parked outside of his residence. Reynolds also stated that Morales stored his gun inside of the vehicle. CCO Thompson found the keys to the vehicle on Morales's desk. CCO Thompson used the keys to unlock the vehicle parked outside and found a handgun under the driver's seat.

Tacoma Police Officer Jeff Thiry was also on scene during the search of Morales's home. Officer Thiry placed the recovered firearm and narcotics into evidence. Officer Thiry then advised Morales of his constitutional *Miranda*[2] rights and placed Morales in the back of his patrol vehicle. As he was seated in the patrol car, Morales stated, " 'I know I am screwed. I am headed for prison.' " 9 VRP (Jan. 11, 2017) at 217. Morales then told Officer Thiry that he had bought the firearm approximately a week before the search. Officer Thiry asked Morales whether he knew the gun

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

had been reported stolen, and Morales responded, " 'Aren't most guns you get off the streets stolen?' " 9 VRP (Jan. 11, 2017) at 217.

Morales also told Officer Thiry that he sold drugs because he " 'had to do something to make money' " after he lost his job. 9 VRP (Jan. 11, 2017) at 218. And Morales told Officer Thiry that he had the firearm because " 'I sell drugs and I need it for protection.' " 9 VRP (Jan. 11, 2017) at 218.

C.      CrR 3.5 AND CrR 3.6 MOTIONS

The State charged Morales with two counts of unlawful possession of a controlled substance with intent to deliver, one count of first degree unlawful possession of a firearm, and one count of possession of a stolen firearm. Morales filed pretrial motions to suppress the statements and evidence obtained as a result of the search under CrR 3.5 and CrR 3.6.

Officer Thiry and CCO Darrin Patterson, who assisted CCO Thompson in the search of Morales's home, testified at the CrR 3.5 hearing. Officer Thiry testified to the above discussed statements that Morales made to him following arrest. CCO Patterson testified that Morales initially denied ownership of the narcotics found inside of the jacket. However, later Morales admitted to CCO Patterson and the other CCOs present during the search that the drugs were his.

At the CrR 3.6 hearing, CCO Thompson testified to the facts discussed above.

The trial court ruled that the search of Morales's home was constitutional and that Morales's statements were made voluntarily after being advised of his constitutional rights. Accordingly, the trial court denied Morales's motion to suppress the evidence seized from his home and the statements Morales made to law enforcement.

D.      REQUESTS FOR NEW DEFENSE COUNSEL

On the morning of his scheduled trial date, Morales asked for a continuance in order to retain private counsel. Morales informed the court that his current attorney was ineffective because he had failed to interview witnesses that could testify on Morales's behalf. The trial court denied Morales's motion for a continuance.

The next day, Morales again addressed the trial court and voiced concern over his counsel's performance. Morales criticized his counsel for failing to call two witnesses for the CrR 3.5 hearing that Morales believed would have been favorable to his defense.

Counsel addressed the trial court and explained that the two witnesses Morales wanted to call were Kimberly Hector and Reynolds. Counsel had spoken with Hector the day before trial in the courthouse hallway. Counsel had to leave the conversation to go to court, but asked Hector to briefly wait for him in the hallway. When counsel returned a few minutes later, Hector had left. Counsel's defense investigator attempted to contact Hector multiple times that night. The defense investigator also went to Hector's house. The defense investigator learned that Hector was unavailable. Counsel also informed the court, "[F]rankly, based upon what I learned from her, I probably wouldn't be calling her anyway." 3 VRP (Jan. 10, 2017) at 132.

As to Reynolds, counsel explained that she was currently in jail. Counsel expressed that he had "some trepidation" about calling Reynolds, but that he had subpoenaed her based on Morales's request.[3]  3 VRP (Jan. 10, 2017) at 132.

---

[3] The next day after the hearing, defense counsel was advised by Reynolds's attorney that she did not wish to testify and if brought to court, Reynolds would assert her Fifth Amendment right to remain silent.

The trial court advised Morales that he had "a very competent attorney" who was working with him, and that counsel was doing the best he could to pursue the issues Morales raised. 3 VRP (Jan. 10, 2017) at 133. The court declined to continue the trial based on Morales's grievances with counsel.

After the first two witnesses testified at trial, Morales made a motion " 'to go pro se to represent myself or for a new lawyer.' " 9 VRP (Jan. 11, 2017) at 196. Morales wrote out his motion, and his counsel read the motion to the court. Morales's motion stated:

> I want Motion to go pro se[] or represent [myself] or for <u>new lawyer</u>.
>
> Bases of      1. Not helping
> 2. Not knowing my case.
> 3. Not speaking for me like a defense attorney [is] supposed to[]
> 4. Knowing of his errors. [N]ot trying to fix or do anything to let courts know of mistake.
> 5. We should have a Gameplan[] to beat this case!!! ask this lawyer what his Game plan is.
> 6. Not putting forth the fact that I did not live there and car not mine.

Exhibit 9.

Morales also wrote:

> When I say motion I mean: I write out what the problem is and explain out loud or at least be able [t]o let my [t]houghts be heard. Not no one else's thoughts if I'm in contempt then arrest me but not letting [t]he defend[a]nt in his trial have his right to fairness like letting false testimony [b]e ad[]mitted in court and not [h]aving either a[n] [a]ttorney or letting [t]he defendant [t]ell the [j]udge and [t]he motion [b]e heard is <u>unconstit[ut]iona[l]</u>.

Exhibit 10.

In response to Morales's motion, defense counsel again explained that the witnesses Morales wanted to call were unavailable. Morales addressed the trial court and solely complained about his counsel's performance. Morales claimed that his counsel was "not defending [him]" and

"ha[d] no defense." 9 VRP (Jan. 11, 2017) at 200. Morales also criticized the way his counsel had cross-examined the first two witnesses who had testified at trial. The trial court responded that it did not accept Morales's premise that his counsel had failed to defend him. The trial court advised that counsel had explained his reasons for not calling Morales's suggested witnesses, and that an attorney could not call a witness simply to have that witness assert her Fifth Amendment right in front of a jury. Morales interjected and stated, "I don't believe that happened." 9 VRP (Jan. 11, 2017) at 202.

Morales also interrupted and claimed that he told counsel about these two witnesses more than a year ago. Counsel responded, "[a]ctually, and I don't want to talk about what you and I have discussed, but it was a relatively recent occurrence." 9 VRP (Jan. 11, 2017) at 202-03.

At no point during this discussion did Morales reference his written request to represent himself at trial. The discussion solely focused on Morales's discontent with his counsel.

E.      RELEVANT PORTIONS OF TRIAL

CCO Thompson, CCO Patterson, and Officer Thiry testified at trial. CCO Thompson testified to the search of Morales's residence as discussed above. CCO Thompson did not testify about any of the informant tips that provided the basis for the search.

CCO Patterson testified that he overheard Morales admit ownership of the drugs to Officer Thiry. Officer Thiry also testified to the above discussed statements that Morales made to him.

The jury found Morales guilty of unlawful possession of a controlled substance with intent to deliver, first degree unlawful possession of a firearm, and one count of possession of a stolen firearm. The jury found Morales not guilty of the second count of unlawful possession of a

controlled substance with intent to deliver, but found him guilty of the lesser included crime of unlawful possession of a controlled substance.[4]

F.    SENTENCING

Morales made a "motion to go pro se" prior to sentencing. VRP (May 5, 2017) at 2. The trial court heard the motion approximately two weeks before Morales's scheduled sentencing date. At the hearing, Morales's counsel advised the court that Morales was either requesting a new attorney or requesting to self-represent.

Morales addressed the trial court and explained that he did not want to be represented by his attorney any longer. Morales informed the court that he had filed three bar complaints against his attorney, and accused his attorney of violating his constitutional rights and failing to help him. At no point during this discussion did Morales reference his request to proceed pro se at sentencing.

The trial court acknowledged that Morales had issues with his counsel over the course of his case. However, the court explained that Morales's trial counsel effectively cross-examined the witnesses and defended Morales during trial. The trial court ruled that it was not going to substitute a new attorney to represent Morales at sentencing.

Approximately two weeks later, Morales retained new counsel, and the trial court entered an order authorizing the substitution of counsel. Morales's new attorney filed a motion for a new trial, which the court denied. Morales's new attorney also represented Morales at sentencing.

---

[4] The jury also returned a special verdict finding that Morales was armed with a firearm during the commission of the crimes of unlawful possession of a controlled substance with intent to deliver and unlawful possession of a controlled substance.

8

The court sentenced Morales to 226 months of confinement. The sentencing court also imposed a $500.00 crime victim assessment fee, $100.00 DNA database fee, and a $200.00 criminal filing fee. The court later entered an order of indigency and appointed an attorney at public expense to represent Morales in an appeal.

Morales appeals.

## ANALYSIS

A. RIGHT TO PROCEED PRO SE

Morales argues that the trial court abused its discretion when it failed to consider or rule on his requests to proceed pro se. We disagree.

### 1. Standard of Review

We review the trial court's denial of a request for pro se status for an abuse of discretion. *State v. Madsen*, 168 Wn.2d 496, 504, 229 P.3d 714 (2010). A court abuses its discretion if its decision is manifestly unreasonable, rests on unsupported facts, or was reached by applying an incorrect legal standard. *Id.* A trial court also abuses its discretion if it fails to exercise its discretion, such as when it fails to reach a necessary decision. *State v. Stearman*, 187 Wn. App. 257, 265, 348 P.3d 394 (2015).

### 2. Morales's Requests were Equivocal

The Washington Constitution and the United States Constitution guarantee criminal defendants the right to self-representation. *State v. Curry*, 191 Wn.2d 475, 482, 423 P.3d 179 (2018). Defendants are afforded this fundamental right despite the potentially detrimental impact on the defendant and the administration of justice. *Madsen*, 168 Wn.2d at 503. "The unjustified

denial of this right requires reversal." *State v. Stenson*, 132 Wn.2d 668, 737, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998).

At the same time, "[t]he right to proceed pro se is neither absolute nor self-executing." *Madsen*, 168 Wn.2d at 504. The defendant must unequivocally request to proceed pro se before he or she can be permitted to do so. *Curry*, 191 Wn.2d at 482-83. Whether a defendant's request for self-representation is unequivocal is determined on a case-by-case basis, considering the defendant, the circumstances, and the request. *Id.* at 485. "[A]n unequivocal request to proceed pro se requires a defendant to 'make an explicit choice between exercising the right to counsel and the right to self-representation so that a court may be reasonably certain that the defendant wishes to represent himself.' " *Id.* at 490 (quoting *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994)). In order for the trial court to be reasonably certain that a defendant wishes to represent himself, the trial court must first determine whether (1) a request was made at all, and (2) if so, whether the defendant's request reflected a desire to exercise the right to self-representation. *Id.*

The trial court is required to "indulge in 'every reasonable presumption against a defendant's waiver of his or her right to counsel.' " *Madsen*, 168 Wn.2d at 504 (internal quotation omitted) (quoting *In re Det. of Turay*, 139 Wn.2d 379, 396, 986 P.2d 790 (1999), *cert. denied*, 531 U.S. 1125 (2001)). However, "[t]his presumption does not give a court carte blanche to deny a motion to proceed pro se." *Id.* The limited grounds upon which a trial court may deny defendant's request to proceed pro se are a finding that the request is equivocal, untimely, involuntary, or made without a general understanding of the consequences of such request. *Id.* at 504-05. The trial court's finding "must be based on some identifiable fact." *Id.* at 505.

10

Our Supreme Court has noted that, "[w]hile a request to proceed pro se as an alternative to substitution of new counsel does not necessarily make the request equivocal . . . such a request may be an indication to the trial court, in light of the whole record, that the request is not unequivocal." *Stenson*, 132 Wn.2d at 740-41 (citing *Hamilton v. Groose*, 28 F.3d 859, 862 (8th Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995); *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir. 1989); *People v. Williams*, 220 Cal. App. 3d 1165, 269 Cal. Rptr. 705, 707-08 (1990)). Such is the case here.

Although Morales made two motions to proceed pro se, both requests were an alternative to obtaining substitute counsel. Morales repeatedly voiced his frustration with his court-appointed counsel over the course of his case.

After the first two witnesses had testified at trial, Morales made " 'a motion to go pro se to represent myself or for a new lawyer.' " 9 VRP (Jan. 11, 2017) at 196 (quoting Exhibit 9). Given that trial had already started, this request was untimely. *See Madsen*, 168 Wn.2d at 504 (A defendant's request to proceed pro se must be unequivocal and timely). The request was also equivocal. When given the opportunity to address his motion, Morales solely focused on his frustration with his counsel, and his desire to have new counsel appointed to represent him. Morales repeatedly asserted that his counsel had failed to defend him, failed to discredit the witnesses who testified against him, and failed to contact other witnesses that Morales suggested. At no point did Morales request to proceed pro se.

Morales made his second request to proceed pro se just before sentencing as an alternative to obtaining substitute counsel. When given the opportunity to discuss his request, Morales solely complained of his attorney's performance at trial. He told the trial court that he had filed multiple

11

bar complaints against his attorney, and accused his attorney of violating his constitutional rights and failing to defend him. Again, Morales never referenced his request to proceed pro se during this discussion.

As explained above, "[t]he right to proceed pro se is neither absolute nor self-executing." *Madsen*, 168 Wn.2d at 504. Before Morales could be permitted to proceed pro se, he needed to make an unequivocal request to do so. *See Curry*, 191 Wn.2d at 482-83 ("[A] defendant must unequivocally request to proceed pro se before he or she will be permitted to do so."). Based on the record as a whole, we hold that both of Morales's requests to proceed pro se were equivocal. Because the record is clear that Morales's only argument to the trial court pertained to his request to substitute counsel, the trial court did not abuse its discretion in failing to rule on his request to proceed pro se.

B. INEFFECTIVE ASSISTANCE OF COUNSEL

Morales argues that his counsel was ineffective for failing to investigate and interview his suggested witness until after trial began. We disagree.

1. Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 135 S. Ct. 153 (2014). An ineffective assistance of counsel claim is a mixed question of fact and law that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Grier*, 171 Wn.2d at 32-33 (citing

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). If the defendant fails to satisfy either prong, the defendant's ineffective assistance of counsel claim fails. *Id.* at 33 (citing *Strickland* 466 U.S 688).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id.* We engage in a strong presumption that counsel's performance was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant may overcome this presumption by showing that " 'there is no conceivable legitimate tactic explaining counsel's performance.' " *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Our Supreme Court has held that the record before this court must be sufficient for this court to determine what counsel's reasons for the decision is in order to evaluate whether counsel's reasons were legitimate. *State v. Linville*, 191 Wn.2d 513, 525-26, 423 P.3d 842 (2018). If counsel's reasons for the challenged action are outside the record on appeal, the defendant must bring a separate collateral challenge. *Id.*

To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862. This standard is lower than a preponderance standard, but does require the defendant to affirmatively "show more than a 'conceivable effect on the outcome.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)).

2.     Morales Fails to Show Ineffective Assistance of Counsel

Morales argues that his counsel's failure to investigate potential witnesses until after trial began fell below an objective standard of reasonableness. Morales also argues that he was

prejudiced by this deficient performance because he would have negotiated and accepted a plea offer had Morales known that his suggested witnesses were unable to testify. We disagree.

After two witnesses had testified, Morales informed the trial court that he wanted his counsel to call two witnesses on his behalf—Hector and Reynolds. In response, Morales's counsel explained that he had contacted both witnesses and neither was available. Counsel informed the trial court about his interaction with Hector in the courthouse hallway the day before trial and how Hector left despite being asked to wait. Counsel also informed the court about subsequent unsuccessful efforts to locate Hector and stated "frankly, based upon what I learned from her, I probably wouldn't be calling her anyway." 3 VRP (Jan. 10, 2017) at 132.

As to Reynolds, Morales's counsel informed the court that he had subpoenaed her and that Reynolds was currently in custody. Counsel explained that he had "some trepidation" about calling Reynolds, but informed the court that he might call her as a witness because of Morales's continued request to do so. 3 VRP (Jan. 10, 2017) at 132. When the parties returned to court the next day, Morales again voiced his concern that his counsel had refused to call his suggested witnesses. Counsel explained that Reynolds was charged with several crimes, and that Reynolds's lawyer had informed counsel that Reynolds would invoke her Fifth Amendment right to remain silent if she were brought to court.

Nonetheless, Morales argues that his counsel's performance was objectively unreasonable because his counsel waited until after trial began to investigate the availability of these two witnesses. According to Morales, he asked his counsel to investigate and interview these witnesses more than a year before trial. However, the record does not support Morales's contention.

14

After trial had started, Morales's counsel again explained that he had been unable to contact Hector. Morales interrupted and stated, "I told him about her a year ago. Why didn't he never try to contact her?" 9 VRP (Jan. 11, 2017) at 202. Morales's counsel responded, "Actually, and I don't want to talk about what you and I have discussed, but it was a relatively recent occurrence." 9 VRP (Jan. 11, 2017) at 202-03. Thus, the record does not clearly support Morales's contention that he asked counsel to contact these witnesses more than a year before trial. And even if Morales had made this request, Morales cannot show based on the record before this court that his counsel's performance fell below an objective standard of reasonableness. The record contains no information that these witnesses were available prior to trial or willing to meet with defense counsel prior to trial. The record also provides no information regarding counsel's reasons for not meeting with these two witnesses sooner. Thus, Morales fails to show deficient performance based on the record before this court.

Morales also fails to show prejudice. Morales argues that he was prejudiced by his counsel's failure to timely investigate the potential witnesses because Morales might have "more rigorously sought to negotiate a plea" had he known that the witnesses would be unavailable to testify at trial. Br. of Appellant at 13. However, when Morales's counsel informed the trial court that Reynolds was unwilling to testify, Morales interjected, "I don't believe that happened." 9 VRP (Jan. 11, 2017) at 202. Thus, the record shows that Morales was unwilling to accept his counsel's representation that these witnesses were unavailable. Morales, therefore, fails to show a reasonable probability that Morales would have attempted to negotiate a plea had his counsel informed him earlier that these witnesses were unavailable. Because Morales fails to show either deficient performance or prejudice, his ineffective assistance of counsel claim fails.

C.      CRIMINAL FILING FEE AND DNA FEE

Morales argues that the imposed criminal filing fee and DNA fee are no longer authorized following the enactment of legislative amendments to statutes relating to legal financial obligations.[5]  The State agrees that the imposed fees should be stricken.  We accept the State's concession and remand to the trial court to strike the imposed criminal filing fee and DNA fee.

Recent legislation prohibits the sentencing court from imposing discretionary LFOs, criminal filing fees, or accrued interest on the nonrestitution portions of LFOs on indigent defendants.  RCW 10.01.160(3); RCW 36.18.020(h); RCW 10.82.090; *State v. Ramirez*, 191 Wn.2d 732, 746, 426 P.3d 714 (2018).  A DNA fee is mandatory "unless the state has previously collected the offender's DNA as a result of a prior conviction."  RCW 43.43.7541.

Here, the sentencing court signed an order of indigency for Morales to pursue an appeal at public expense.  The imposition of a criminal filing fee on indigent defendants is prohibited.  Therefore, we remand to the sentencing court to strike the criminal filing fee.

Also, the State represents that Morales's DNA was previously collected and is on file with the Washington State Patrol Crime Lab.  Accordingly, we also remand to the sentencing court with instruction to strike the DNA fee.

D.      STATEMENT OF ADDITIONAL GROUNDS

Morales raises numerous issues in a SAG.  We hold that each of these assigned errors fail.

---

[5]  Codified on June 7, 2018, ESHB 1783 amends certain RCWS related to LFOs.  LAWS OF 2018, ch. 269, §17.  ESHB 1783 eliminates interest accrual on the nonrestitution portions of imposed LFOs, prohibits imposing of a criminal filing fee on indigent defendants, and provides that DNA collection is no longer mandatory if the defendant's DNA has previously been collected as the result of a prior conviction.  RCW 36.18.020(2)(h); RCW 10.01.160(3); RCW 43.43.7541; *State v. Ramirez*, 191 Wn.2d 732, 746-47, 426 P.3d 714 (2018).

1.    CrR 3.6 Hearing

Morales argues that CCO Thompson offered false testimony at the CrR 3.6 hearing because she testified to information that was not contained in her incident report.  Specifically, Morales contends that the information that Morales was not in compliance with his drug treatment program was never included in CCO Thompson's original report.

CCO Thompson's incident report is not contained in the record.  Therefore, we cannot address this issue in direct appeal.  Morales also references a January 2017 email from one of the deputy prosecuting attorneys who handled his case to support this claim.  This email is likewise not contained in the record.  If Morales wishes to raise issues on appeal based on evidence or facts outside of the existing record, then a personal restraint petition is the appropriate means to do so.  *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251, *as amended* (Sept. 13, 1995).

Morales also argues that the trial court should have granted his motion to suppress evidence obtained through the search of his home because the informants' tips to CCO Thompson were unreliable.  Relying on *State v. Z.U.E.*, 183 Wn.2d 610, 352 P.3d 796 (2015), Morales contends that the informants' tips were unreliable because their contact information was not provided.  Morales also contends that without contact information, the informants were anonymous.

*Z.U.E.* is not applicable here.  *Z.U.E.* involved a challenge to the validity of a *Terry* stop based on a series of anonymous 911 calls.  183 Wn.2d at 615, 617.  Our Supreme Court applied a " 'totality of the circumstances' " approach to determine whether a tip from an anonymous 911 caller was sufficiently reliable to justify a *Terry* stop.  *Id.* at 621 (quoting *Navarette v. California*, 572 U.S. 393, 395, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014)).  Unlike in *Z.U.E.*, the search of Morales's home and vehicle was not a *Terry* stop, and the search was not based on anonymous

911 calls. CCO Thompson knew the identity of both informants. One informant was the mother of the leaseholder for the residence. The other informant was Morales's treatment provider. The identities of these individuals were known. We hold that Morales's challenge based on unreliable informants' tips fail.

2.     Search of the Vehicle

Morales argues that evidence of the firearm should have been suppressed because it was the fruit of an illegal search of the vehicle he had been driving. Morales asserts that the officers did not have probable cause to search the vehicle because it was not registered in Morales's name and they did not have a warrant. Morales also raises a hearsay objection to CCO Thompson's testimony at the CrR 3.6 hearing for the first time on appeal.

The Washington State Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. Warrantless searches are per se unreasonable, " 'subject to a few jealously and carefully drawn exceptions.' " *State v. Cornwell*, 190 Wn.2d 296, 301, 412 P.3d 1265 (2018) (internal quotation marks omitted) (quoting *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999)).

Individuals on probation have a reduced expectation of privacy and are not afforded the full protection of article 1, section 7. *Id.* It is constitutionally permissible for a CCO to search an individual on probation solely on a " 'well-founded or reasonable suspicion of a probation violation,' " instead of a warrant supported by probable cause. *Id.* at 302 (quoting *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009)). This exception is codified in RCW 9.94A.631, which states in relevant part, "If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, a [CCO] may require an offender to submit

to a search and seizure of the offender's person, residence, automobile, or other personal property." RCW 9.94A.631(1). This does not give a CCO unfettered right to search the property of someone on probation. *Cornwell*, 190 Wn.2d at 306-07. Rather, a warrantless search of the property of an individual on probation is permissible "only where there is a nexus between the property searched and the alleged probation violation." *Id.* at 306.

The State presented sufficient evidence of such a nexus here. Morales was prohibited from possessing firearms or ammunition as a condition of his sentence. CCO Thompson received multiple reports that Morales had violated this condition of his supervision. Law enforcement informed CCO Thompson that Morales was suspected in a shooting incident because a pool of the victim's blood was found on Morales's front porch. Approximately a week later, the mother of the leaseholder for Morales's residence contacted CCO Thompson and expressed concern that drug users and sellers had been coming and going from Morales's residence late at night. She also told CCO Thompson that Morales had a gun inside of his house and was rumored to have shot someone.

When CCO Thompson searched Morales's residence, she found an empty firearm magazine. During that search, multiple people told CCO Thompson that Morales had been driving the vehicle parked outside his house. Reynolds said that Morales kept his gun inside of the vehicle. And the keys to the vehicle were on Morales's desk. This combined information established a nexus between the vehicle searched and Morales's alleged probation violation of possessing a firearm. Therefore, the warrantless search of the vehicle was permissible.

For the first time on appeal, Morales argues that the statements linking him to the vehicle were inadmissible hearsay. As a general rule, we will not consider an issue raised for the first time

on appeal, unless it is a manifest error affecting a constitutional right. RAP 2.5(a). Morales does not assert that this error is of constitutional magnitude. Morales explicitly states that "[hear]say is a little different" than his constitutional right to confront his accuser claim. SAG at 10. Therefore, we do not consider Morales's hearsay objections to CCO Thompson's testimony that are raised for the first time on appeal. *See* RAP 2.5(a).

### 3. Confrontation Clause

Next, Morales argues that he was denied his constitutional right to confront his accusers because the State never provided him the contact information of the informants who reached out to CCO Thompson. This assignment of error concerns CCO Thompson's testimony at the CrR 3.6 evidentiary hearing. CCO Thompson testified that two informants provided information that Morales was violating the conditions of his supervision. The first informant was the mother of the leaseholder for Morales's residence, who expressed concern about "drug traffic" in and out of Morales's residence. 1 VRP (Jan. 5, 2017) at 23. The other informant was Morales's treatment provider, who notified CCO Thompson that Morales had failed several urinalysis tests and missed several required treatment classes. CCO Thompson did not testify to any of the informants' statements at Morales's trial.

Relying on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), Morales argues that this testimony violated his right to confront his accusers. *Crawford* established a rule barring admission of testimonial hearsay at trial when the declarant witness is unavailable and there has been no prior opportunity to cross examine. *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). However, "nothing in *Crawford* suggests that the Supreme Court intended to change its prior decisions allowing the admission of hearsay at pretrial

proceedings, such as a suppression hearing." *Id.* "[T]here is no right to confrontation at a pretrial CrR 3.6 evidentiary hearing on a motion to suppress under the Sixth Amendment and *Crawford*." *Id.* at 173. Therefore, Morales's assignment of error on this basis fails.

### 4. Ineffective Assistance of Counsel

Morales raises several ineffective assistance of counsel claims in his SAG. We hold that each of these claims fail.

As explained above, to prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Grier*, 171 Wn.2d at 32-33 (citing *Strickland* 466 U.S 688). An ineffective assistance of counsel claim fails if the defendant fails to satisfy either prong. *Id.* at 33 (citing *Strickland* 466 U.S 688).

Morales first argues that his counsel was ineffective for advising him that the trial court's ruling on his CrR 3.6 suppression motion could be challenged on appeal. Counsel was correct that Morales could challenge the trial court's denial of a CrR 3.6 suppression motion on appeal. *See e.g.*, *State v. Z.U.E.*, 178 Wn. App. 769, 778, 315 P.3d 1158 (2014), *aff'd*, 183 Wn.2d 610 (2015) ("When reviewing the trial court's denial of a CrR 3.6 suppression motion, we determine whether substantial evidence supports the challenged findings of fact and whether the findings of fact support the conclusions of law."). Thus, counsel's advice was not erroneous and counsel's performance did not fall below an objective standard of reasonableness. Morales's ineffective assistance of counsel claim on this basis fails.

Next, Morales argues that counsel was ineffective for failing to object at the CrR 3.6 hearing to CCO Thompson's testimony. Morales argues that his counsel should have objected to

21

the portions of CCO Thompson's testimony that differed from her incident report. Again, this incident report is not contained in the record. Thus, Morales cannot show ineffective assistance of counsel on this basis.

Morales also argues that counsel was ineffective for implying that Morales owned the vehicle during closing argument at the CrR 3.6 hearing. At the CrR 3.6 hearing, counsel argued that any evidence obtained through the search of the vehicle should be suppressed because "there [was] absolutely zero evidence that Mr. Morales was using drugs in his car, or his house for that matter." 1 VRP (Jan. 5, 2017) at 73.

As explained above, the propriety of a search does not depend on ownership of the vehicle to be searched. A CCO may search the property of someone on probation when "there is a nexus between the property searched and the alleged probation violation." *Cornwell*, 190 Wn.2d at 306. Here, multiple people reported that Morales had been driving the vehicle, and Reynolds told CCO Thompson that Morales stored a firearm in the vehicle. This evidence established a nexus between the vehicle and Morales's probation violation. Counsel's performance did not fall below an objective standard of reasonableness simply because he referred to the vehicle as Morales's vehicle at the close of the CrR 3.6 hearing. Thus, Morales's ineffective assistance of counsel claim on this basis fails.

Morales also argues that his counsel was ineffective for failing to pressure the State into releasing the informants' contact information. However, the record contains no information as to whether counsel did or did not make such request. And even if counsel did not ask the State for this information, the record contains no information regarding why counsel did not ask the State for this information. Therefore, Morales cannot show ineffective assistance of counsel on this

basis, and he must bring a separate, collateral challenge if he wishes a reviewing court to consider matters outside of the record. *See Linville*, 191 Wn.2d at 525-26.

Next, Morales maintains that his counsel was ineffective for failing to call his requested witnesses at trial. As discussed above, both witnesses that Morales wanted to testify on his behalf were unavailable. Counsel's defense investigator repeatedly, but unsuccessfully, tried to contact one of the witnesses, and the other witness had pending criminal charges and would have refused to testify based on her counsel's advice. Thus, the record shows a legitimate tactic explaining counsel's performance, and Morales's ineffective assistance of counsel claim on this basis fails.

Morales also contends that he was denied the effective assistance of counsel because his counsel had a conflict of interest. A conflict of interest may arise where the defendant's lawyer has previously represented one of the witnesses in the case, or represents multiple codefendants in a case. *State v. Dhafliwal*, 150 Wn.2d 559, 568, 79 P.3d 432 (2003). Here, the only conflict Morales asserts was his dissatisfaction with his counsel's performance. This does not constitute a conflict of interest, and Morales's ineffective assistance of counsel claim on this basis fails.

Finally, Morales argues that he was denied effective assistance of counsel at the CrR 3.5 hearing because his counsel (1) failed to impeach CCO Patterson, (2) failed to request a mistrial, and (3) failed to request reconsideration of the trial court's ruling. Each of these claims fail.

Morales maintains that CCO Patterson's trial testimony differed from his testimony at the CrR 3.5 hearing. Specifically, at the CrR 3.5 hearing, CCO Patterson testified that Morales admitted ownership of the drugs to CCO Patterson and other community corrections officers present at the time. However, at trial, CCO Patterson testified that he heard Morales admit

ownership of the drugs to Officer Thiry. Morales argues that his trial counsel was ineffective for failing to impeach CCO Patterson on this inconsistency.

"There is a strong presumption that counsel's performance was reasonable." *Kyllo*, 166 Wn.2d at 862. To overcome this presumption, Morales must show that " 'there is no conceivable legitimate tactic explaining counsel's performance.' " *Grier*, 171 Wn.2d at 33 (quoting *Reichenbach*, 153 Wn.2d at 130). Here, counsel's reasons for not impeaching CCO Patterson could be characterized as legitimate trial strategy or tactic. Counsel may have wanted to avoid the risk of emphasizing this testimony and the series of incriminating statements that Morales made to law enforcement. Thus, Morales fails to rebut the strong presumption that his counsel's performance was reasonable.

And even if counsel's performance was deficient, Morales fails to show prejudice. Ample evidence linked Morales to the drugs found in his home and the firearm found in the vehicle that he had been driving. CCO Thompson found drug paraphernalia throughout Morales's residence. She also found a magazine for a handgun in Morales's bedroom. The officers found drugs in Morales's jacket pocket. Morales admitted to law enforcement that the jacket and its contents belonged to him. And following his arrest, Morales told Officer Thiry, " 'I know I am screwed. I am headed for prison.' " 9 VRP (Jan. 11, 2017) at 217. Morales also admitted to Officer Thiry that he obtained the firearm approximately a week before the search. When asked whether the gun was stolen, Morales responded, " 'Aren't most guns you get off the streets stolen?' " 9 VRP (Jan. 11, 2017) at 217. Thus, Morales fails to show a reasonable probability that the outcome of his trial would have differed had his counsel impeached CCO Patterson on the minor inconsistency in CCO Patterson's trial testimony.

Morales's claim that his counsel was ineffective for failing to move for a mistrial based on CCO Patterson's inconsistent testimony is also without merit. A trial court " 'should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly.' " *State v. Rodriguez*, 146 Wn.2d 260, 270, 45 P.3d 541 (2002) (*State v. Kwan Fai Mak*, 105 Wn.2d 692, 701, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986)). There is no indication in the record that CCO Patterson's inconsistent testimony prejudiced Morales to the extent that nothing short of a new trial could have insured a fair trial. Morales had the opportunity to object to CCO Patterson's testimony and to cross-examine CCO Patterson. Morales fails to show a reasonably probability that the trial court would have granted a request for a mistrial on this basis, and his ineffective assistance of counsel claim fails.

Similarly, Morales fails to show he was denied effective assistance of counsel because his trial counsel failed to ask that the CrR 3.5 hearing be reheard in light of this testimony. The purpose of a pretrial confession hearing under CrR 3.5 is to allow the court to determine whether the defendant's statements are admissible at trial. CrR 3.5(a); *State v. Fanger*, 34 Wn. App. 635, 636-37, 663 P.2d 120 (1983). At the hearing, the trial court must determine whether, under the totality of the circumstances, the defendant's confession to law enforcement was coerced. *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363 (1997). Morales does not assert that the statements he provided to law enforcement were coerced. And an inconsistency in CCO Patterson's testimony as to which officer Morales made these statements to does not evidence coercion. Thus, Morales fails to show that this was a basis for his counsel to request a new CrR 3.5 hearing. Because Morales fails to show that his counsel's performance fell below an objective standard of reasonableness, his ineffective assistance of counsel claim on this basis fails.

        5.      Prosecutorial Misconduct

Morales argues that the State committed prosecutorial misconduct by (1) falsely informing the court that Morgan Godsey had contacted CCO Thompson, rather than Godsey's mother, (2) allowing CCO Thompson to testify to new information not contained within her incident report, and (3) allowing CCO Patterson to commit perjury. We hold that each of these claims fail.

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail in a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012).

Morales fails to make this showing here. First, Morales relies on a statement that the prosecutor made to the trial court during argument on Morales's motion for a new trial following his guilty verdict. Given that this statement was made after trial, Morales cannot show that he was deprived of his constitutional right to a fair trial based on this statement.

Second, as explained above, CCO Thompson's incident report is not in the record before this court. Therefore, Morales cannot show prosecutorial misconduct on this basis.

And finally, Morales fails to show that the prosecutor allowed CCO Patterson to commit perjury while testifying at trial. This claim is again based on the asserted inconsistency in CCO Patterson's testimony between the CrR 3.5 hearing and trial. It is true that the State has a duty to not elicit perjury or present false testimony. *State v. Finnegan*, 6 Wn. App. 612, 616, 495 P.2d 674 (1972), *cert. denied*, 410 U.S. 967 (1973). However, to succeed in a claim that the prosecutor elicited false testimony, Morales must show (1) that the testimony was actually false, (2) the prosecutor knew or should have known that the testimony was false, and (3) the false testimony

was material. *See United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003), *cert. denied*, 540 U.S. 1208 (2004).

Here, CCO Patterson's trial testimony was not materially inconsistent with his testimony at the CrR 3.5 hearing. At the CrR 3.5 hearing, CCO Patterson testified that Morales admitted ownership of the drugs to CCO Patterson and other community corrections officers present at the scene. At trial, CCO Patterson testified that he heard Morales admit ownership of the drugs to Officer Thiry. Thus, in both instances, CCO Patterson testified that Morales had claimed ownership of the drugs to law enforcement. Morales fails to show that CCO Patterson's testimony was false based on the minor inconsistency as to which specific officer Morales admitted ownership to. And even if this testimony was false, there is no evidence that the prosecutor knew or should have known that this testimony was false, or that this testimony was material. Therefore, we reject Morales's prosecutorial misconduct claim on this basis.[6]

6.      Cumulative Error Doctrine

Morales asserts that the cumulative effect of the errors he raises in his SAG entitle him to a new trial. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. Because Morales fails to show he was affected by any error, he is not entitled to a new trial based on the cumulative error doctrine.

---

[6] Morales also claims that his due process rights were violated because CCO Patterson submitted false and perjured testimony at trial. Because Morales fails to show that the prosecutor elicited false and perjured testimony at trial, we similarly reject Morales's claim on this basis.

No. 50782-0-II

   7.     Request for Additional Briefing

Finally, Morales asks this court to exercise our discretion and request additional briefing on the errors Morales raises in his SAG. Under RAP 10.10(f), we may request additional briefing from counsel to address the issues raised in the defendant's SAG. However, additional briefing is not necessary to resolve the issues raised here, and we decline to make such request.

We affirm Morales's convictions, but remand to the trial court to strike the imposed criminal filing fee and DNA fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

                                                      _____, A.C.J.
                                                      Lee, A.C.J.

We concur:

_____
Sutton, J.

_____
Cox, J.P.T

28